**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**SARAH ARMISTEAD**,

      Plaintiff,

  vs.                                        No**.**    **CIV 06-0017 MCA/DJS**

**ALLSTATE INSURANCE COMPANY**,

      Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on *Defendant's Motion in Limine to Exclude Speeding Testimony* [Doc. 36] filed on March 5, 2007, and *Defendant's Motion in Limine to Exclude Certain Opinion Testimony of John Franco, M.D.* [Doc. 39] filed on March 9, 2007. The Court directed the parties to submit a complete copy of Dr. Franco's deposition testimony and the two medical articles therein on April 3, 2007. [Doc. 53.] The Court then held a hearing on the above motions on April 5, 2007, at which counsel for both parties were present. Having considered the parties' written submissions and oral arguments, the relevant law, and otherwise being fully advised in the premises, the Court grants Defendant's motion to exclude Mr. Fisher's opinion testimony that Ms. Gallegos' vehicle was speeding, and denies Defendant's motion to exclude Dr. Franco's opinion testimony regarding the probability that Plaintiff's ankle injury will cause her to develop post-traumatic arthritis, for the reasons set forth below.

**I.       BACKGROUND**

This first phase of this bifurcated action involves the adjudication of an underinsured motorist claim against Defendant Allstate Insurance Company for damages arising out of an intersection collision between Plaintiff Sarah Armistead's vehicle and a vehicle driven by Valerie Gallegos, who is not a party to this case. Generally speaking, the elements of an underinsured motorist claim include: (1) that the insured plaintiff is covered by the underinsured motorist provisions of the insurance policy issued by the insurer; (2) that the insured plaintiff gave the insurer timely notice of the claim as required under the policy; (3) that the alleged tortfeasor is underinsured (*i.e.*, the applicable limits of the alleged tortfeasor's insurance coverage are less than the applicable limits of the insured plaintiff's underinsured motorist coverage and the insured plaintiff's actual damages); and (4) that the insured plaintiff is legally entitled to recover damages from the alleged tortfeasor. See generally 24 Eric Mills Holmes, Appleman on Insurance 2d §§ 149.1 to 149.3 (2004).

In this case, counsel for both parties have represented that there are no disputed issues pertaining to the interpretation of the insurance policy itself, and thus the only element of Plaintiff's underinsured motorist claim that needs to be submitted to the jury at trial is whether she is legally entitled to recover damages from the alleged tortfeasor, Ms. Gallegos. Whether Plaintiff is legally entitled to recover damages from the alleged tortfeasor depends on whether Plaintiff has met her burden of proving all the elements of a common-law negligence claim, including the usual rules for apportioning comparative fault between Plaintiff and the alleged tortfeasor. See id. § 151.1, at 236.

Under New Mexico law, these elements of a common-law negligence claim are typically presented to a jury in the following sequence: (1) whether someone other than the plaintiff was negligent (*i.e.*, Ms. Gallegos, the driver of the other car); (2) whether that other person's negligence was a cause of the plaintiff's injuries and damages; (3) what the total amount of the plaintiff's compensable damages is; and (4) the apportionment of fault between the plaintiff and the other driver (*i.e.*, giving a percentage of fault for each driver that adds up to a total of 100%). See, e.g., NMUJI Civ. 13-1220 (2006). If a jury were to answer these four questions in this case, then the parties' counsel appear to agree that it would be a simple matter of mathematical calculation to arrive at a compensatory damage award and calculate what portion of that award, if any, falls under the Plaintiff's underinsured motorist coverage with Allstate.

Defendant Allstate has filed two motions in limine pertaining to the anticipated testimony that Plaintiff intends to present regarding the elements of a common-law negligence claim against the alleged tortfeasor. The first motion in limine pertains to the testimony of Mr. Burton Fisher, a fact witness who is expected to present testimony relating to the alleged negligence of the other driver, Ms. Gallegos. [Doc. 36.] In his deposition testimony, Mr. Fisher drew the inference that Ms. Gallegos' vehicle was unable to stop and avoid the collision with Plaintiff's vehicle for one of two reasons: either Ms. Gallegos was speeding when she approached the intersection, or she did not see that the light at the intersection had turned yellow. [Fisher Dep., Doc. 37-4.]

Mr. Fisher has admitted, however, that he did not turn his attention to Ms. Gallegos or her vehicle until after he heard the sound of a crash and the collision was already in progress. Because he did not actually perceive what Ms. Gallegos or her vehicle were doing as they approached and entered the intersection, Mr. Fisher's opinion about the speed of Ms. Gallegos' vehicle is instead

based on what he observed after the collision was in progress, *e.g.*, the force of the collision and the fact that other vehicles traveling in the same direction as Ms. Gallegos' vehicle were stopped at the intersection. [Doc. 37-4.] Defendant Allstate asserts that such an opinion based on what the witness observed after the fact is not admissible under Fed. R. Evid. 701 and 403. [Doc. 37-1.]

The second motion in limine pertains to the videotaped deposition testimony of a treating physician, Dr. John Franco, M.D., concerning the scope of Plaintiff's damages for the injury to her ankle she suffered as a result of the collision. At his videotaped deposition, Dr. Franco opined that, as a matter of reasonable medical probability, it is more likely than not that Plaintiff will later develop post-traumatic arthritis as a result of the ankle injury she sustained in the collision. [Franco Dep., Doc. 40-2.]

To reach this opinion, Dr. Franco relied in part on studies which reported that 25% of patients with broken ankles have a bad outcome, meaning "even though the bone may heal, the ankle joint disintegrates, the cartilage disintegrates, and it does not heal, or it wears away, over time, because of the initial impact and because of the injury to the joint." [Doc. 40-2, at 3.] Dr. Franco then drew the inference that Plaintiff faced a significantly higher probability of such a bad outcome, because her ankle injury was particularly severe to begin with. [Doc. 40-2, at 4-5.] On cross-examination, Dr. Franco acknowledged that two of the risk factors identified in the studies (*i.e.*, lack of reduction of the fracture and being a female between 45 and 65 years old) were not present in Plaintiff's case because she was only 25 years old at the time her ankle was broken and the reduction in her fracture was good. [Doc. 40-2, at 6-7.] Defendant Allstate now contends that Dr. Franco did not reliably apply the principles and methods from the two studies to the particular facts and circumstances of Plaintiff's ankle injury, as required under Fed. R. Evid. 702.

## II.  ANALYSIS

With few exceptions that are not raised in the briefing on the motions in limine at issue here, "[t]he admissibility of evidence in diversity cases in federal court is generally governed by federal law." Blanke v. Alexander, 152 F.3d 1224, 1231 (10th Cir. 1998). Thus, the Court applies the Federal Rules of Evidence in determining the admissibility of Mr. Fisher's lay opinion testimony about Ms. Gallegos' vehicle and Dr. Franco's expert testimony about the prognosis for Plaintiff's ankle injury. See Sims v. Great Am. Life Ins. Co., 469 F.3d 870, 877-890 (10th Cir. 2006) (identifying several instances in which a federal district court erred in applying rules of evidence derived from state law).

### A.  Mr. Fisher's Testimony

Under the Federal Rules of Evidence, the testimony of lay witnesses in the form of opinions or inferences is limited to those which are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical or other specialized knowledge." Fed. R. Evid. 701. The boundaries between such opinion testimony by a layperson who witnessed an accident scene and the expert testimony of an accident reconstructionist were recently clarified in Weaver v. Blake, 454 F.3d 1087, 1092 (10th Cir. 2006).

In that case, the district court drew a distinction between a fact witness who observes or collects data at an accident scene, and an expert witness who forms opinions about what

the data means through the application of a scientific or technical methodology.  Under this approach, it was not reversible error to admit testimony of a police accident investigator that "has none of the indicia of an expert opinion based on the specialized methodology or technical measurements of an accident reconstructionist and instead falls closer to what the district court had earlier characterized as 'fact testimony based on his observations at the scene.'"  Id.

This approach accords with the state evidence rules identified in the parties' motion papers, under which lay opinion testimony as to the approximate speed of a moving vehicle may be admissible where the witness actually observed the vehicle in motion from a vantage point that allowed the witness to gauge its speed.  See, e.g., Albers v. Dasho, 355 So. 2d 150, 153 (Fla. Ct. App. 1978); compare 31A Am. Jur. 2d Expert Opinion and Evidence § 97 (2007) (reviewing state laws), with 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 701.03[4][b], at 701-28 (2006) (reviewing federal law). Under those circumstances, the witness' testimony regarding a vehicle's approximate speed may provide a helpful, shorthand way of describing what the witness actually observed.

In this case, however, Mr. Fisher's deposition testimony provides no basis for offering such a description because he has admitted that his attention was not drawn to Ms. Gallegos or her vehicle until *after* he heard the sound of a crash and the collision was already in progress.  Thus, he did not actually observe Ms. Gallegos' vehicle as it approached and entered the intersection immediately before the collision occurred.  Instead, Mr. Fisher's

opinion about the speed of Ms. Gallegos' vehicle before he saw it is based on inferences he drew from his subsequent observation of the force of the collision and the fact that other cars traveling in the same direction as Ms. Gallegos' vehicle had stopped at the intersection. [Fisher Dep., Doc. 37-4.]

Under these circumstances, Mr. Fisher's inferences exceed the permissible scope of lay opinion testimony and do not meet the requirements of Fed. R. Evid. 701. When, as here, the witness' attention was not drawn to the vehicle or its driver until after the collision began, the witness lacks the necessary perception on which to rationally base a lay opinion concerning the vehicle's speed in the preceding moments when it approached and entered the intersection where the collision occurred. See Swajian v. General Motors Corp., 916 F.2d 31, 35-36 (1st Cir. 1990).

To be sure, Mr. Fisher's testimony would not be limited to his own perceptions if he were testifying as an expert witness in the field of accident reconstruction, see Fed. R. Evid. 703, for in that instance his inferences would instead find their basis in a scientific or technical methodology for tracing the data collected after the collision back to its cause, see Fed. R. Evid. 702. But Fed. R. Evid. 701 specifically excludes testimony based on such scientific, technical, or specialized knowledge, and Mr. Fisher admitted at his deposition that he has no training or background as an accident reconstructionist. Similarly, Mr. Fisher is in no position to instruct the jury on the legal conclusions it should draw as to whether the

speed of Ms. Gallego's vehicle violated the law or constituted negligence *per se*.  See Specht v. Jensen, 853 F.2d 805, 807-09 (10th Cir. 1988).

Under these circumstances, Mr. Fisher's *opinion* that Ms. Gallegos' vehicle must have been speeding, or that she must not have seen the light turn yellow, is not helpful to the jury because it is "no more than speculation based on the same facts that the jury [will have] before it" upon receipt of his testimony about what he *actually observed* when he heard the sound of the crash and turned his attention toward the accident scene.  Sims, 469 F.3d at 890.  Lacking either direct perception of what Ms. Gallegos and her vehicle were doing just before the accident or a methodology for accident reconstruction "based on scientific or technical facts outside the juror's common knowledge or experience," Mr. Fisher's opinion testimony will "unduly invade the province of the jury when assistance of the witness is unnecessary" and "'merely tell the jury what result to reach.'"  Sims, 469 F.3d at 889 (quoting Fed. R. Evid. 704 advisory committee notes).

For these reasons, I conclude that any opinions Mr. Fisher might have to offer regarding the reasons he thought Ms. Gallegos' vehicle did not stop at the intersection (*e.g.*, that she was speeding or that she did not see the light turn yellow) must be excluded from his trial testimony.  Such opinions lack the foundation required under Fed. R. Evid. 701, and without such a foundation, their very minimal probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.  See Fed. R. Evid. 403.  It follows that Mr. Fisher's trial testimony about Ms. Gallegos or her vehicle

must be limited to what he *actually observed* during the time frame when his attention was focused on the accident, *i.e.*, after he heard the sound of the two vehicles colliding.

### B.     Dr. Franco's Testimony

Fed. R. Evid. 702 imposes a special gatekeeping obligation on this Court to ensure that  expert testimony is not admitted at trial unless it is both relevant and reliable.  See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999); Daubert v. Merrell-Dow Pharm., Inc., 509 U.S. 579, 592-93 (1993).  The relevance of such testimony also must be weighed against "the danger of unfair prejudice, confusion of the issues, or misleading the jury" as well as "considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.  While the Court is not required to consider any particular set of factors or utilize a particular procedure in making such determinations with respect to expert testimony, the Court must make *some* kind of determination on the record in order to demonstrate that it has performed its gatekeeping function.  See United States v. Velarde, 214 F.3d 1204, 1209 (10th Cir. 2000); Goebel v. Denver and Rio Grande Western R. Co., 346 F.3d 987, 991-92 (10th Cir. 2003).

Preliminarily, this Court notes that counsel did not abide by the trial preparation instructions attached to the *Initial Pretrial Report* [Doc. 16], which state that Daubert motions are to be fully briefed no later than the date designated as the dispositive motion deadline, *i.e.*, November 13, 2006.  Nevertheless,  the Court will address the Daubert motion

pertaining to Dr. Franco's testimony on its merits because neither party was unfairly prejudiced by counsel's failure to meet the deadline specified in the *Initial Pretrial Report*.

In their motion papers, the parties do not dispute Dr. Franco's qualifications to testify about his treatment of Plaintiff's ankle injury, and there is no question that such testimony is relevant to the issue of determining the amount of Plaintiff's damages for purposes of her underinsured motorist claim.  The parties also do not dispute the issue of general causation, *i.e.*, that the type of ankle fracture identified in the two studies cited by Dr. Franco *can* lead to post-traumatic arthritis in some patients.

Instead, the focus of the parties' dispute over Dr. Franco's expert testimony is on the more specific question of whether he has a reliable basis for opining that *this Plaintiff* is likely to develop post-traumatic arthritis in her ankle as a result of the injury she sustained in the collision with Ms. Gallegos' vehicle.  In other words, Defendant Allstate questions the reliability of Dr. Franco's application of the principles and methods he cites to the particular facts and circumstances of Plaintiff's ankle injury.  In raising this question, Defendant invites the Court to "'conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" Goebel, 346 F.3d at 992 (quoting General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).

To fill this gap for purposes of showing that Dr. Franco's opinion concerning the prognosis for Plantiff's ankle injury is admissible under Daubert and its progeny, Plaintiff "need not prove that the expert is undisputably correct or that the expert's theory is

-10-

'generally accepted' in the scientific community." Mitchell v. Gencorp Inc., 165 F.3d 778, 781 (10th Cir.1999). "Instead, the plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts that satisfy Rule 702's reliability requirements." Goebel, 346 F.3d at 991.

The soundness of an expert's methodology may depend on whether it conforms to "accepted protocols that permit the rendition of a causation opinion in terms of 'reasonable medical probability' or 'reasonable medical certainty.'" 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 702.06[2][c], at 702-128 (2006). Adherence to strict protocols is particularly important in toxic tort cases involving long-term exposure to low levels of microscopic pollutants, where an expert's opinion must overcome profound uncertainties "concerning the mechanisms by which medical conditions develop . . . and the difficulties in ruling out other potential causes." Id. at 702-127.

In this case, however, Dr. Franco is simply testifying as a treating physician concerning readily observable features of an acute injury to the bone, joint, and cartilage in Plaintiff's ankle. When he began treating Plaintiff in the emergency room, Dr. Franco observed that "[s]he had a fracture of the ankle and a dislocation of the joint, meaning that the bone was broken badly enough that the foot was not aligned with the leg." [Franco Dep., Doc. 46-2, at 7.] He described this condition as a "high-energy ankle injury," meaning that "a lot of force went through [Plaintiff's] foot and ankle during the injury that caused the

-11-

breaks in the bone, and also resulted in a high amount of energy passing through the cartilage at the ankle joint." [Doc. 46-2, at 24.]

Dr. Franco expanded on this description in the additional portions of his deposition transcript that were provided in response to the Court's *Order* of March 29, 2007. [Doc. 53.] He explains that: "When the ankle is broken, in the manner that [Ms. Armistead's] was broken, the cartilage is fractured, and part of the cartilage goes with the bone." [Franco Dep. at 13.] "In addition, in order to break a bone a tremendous amount of energy has to be delivered through the joint, and so the cartilage sustains a tremendous amount of force, almost a crushing-type injury, and then it breaks and moves out of position." [Id. at 13-14.] This type of severe damage to the cartilage is significant to Plaintiff's prognosis because "there are not as many blood vessels in the cartilage as there is in the bone, so it has a bigger risk of not healing with time, or with injury." [Id. at 16.]

The "post-traumatic arthritis" which, in Dr. Franco's opinion, is likely to result from Plaintiff's ankle injury is "simply, a way to describe . . . disintegration of the joint, where the lining of the joint . . . , the all-important cartilage, dies, disintegrates, is worn away to the point where there is . . . no longer any lining around the bone, and the bones are free to contact one another." [Doc. 46-2, at 20.] "So, basically, it's a worn-out joint that has lost its lining, that we consider the arthritic joint, and that's what [Plaintiff is] at risk for." [Doc. 46-2, at 20-21.]

To form this opinion, Dr. Franco relied on the same methodology that the medical community routinely uses in diagnosing and treating patients who present symptoms of an acute injury at an emergency room, namely a review of the patient's "history, examination, lab and pathology data, and study of the peer-reviewed literature." Benedi v. McNeil-P.P.C., Inc., 66 F.3d 1378, 1384 (4th Cir. 1995).  In this context, the treating physician is not confronted with profound uncertainties concerning the mechanisms by which a particular medical condition develops, because he is simply linking an existing, observable injury to the cartilage in Plaintiff's ankle with her prognosis for further damage or weakening of that same cartilage as her ankle is subjected to a lifetime of use.  Thus, the Court is not called upon to assess the reliability of unorthodox protocols which require a long series of tenuous extrapolations from epidemiological studies in order to bridge the gap between the expert's opinion and the data on which he relies.

I find that the methodology Dr. Franco employed in determining the prognosis for Plaintiff's ankle injury in this case is reliable under Daubert and its progeny.  I further determine that there is no analytical gap between the studies cited by Dr. Franco and his application of those studies to this particular Plaintiff.  Here the gap is filled by the specific and readily observable facts concerning this Plaintiff which Dr. Franco also cites as the basis for his opinion regarding the prognosis for her ankle injury.

Dr. Franco's reasoning is as follows:  the long-term studies report that one in four ankle-fracture patients, or 25%, will eventually develop the type of arthritis described above.

This 25% probability, however, is an average among patients of different ages with a wide spectrum of ankle fractures, ranging from a "minor crack in the bone, without movement," to "the maximal injury, where the bones are maximally . . . out of position." [Doc. 46-2, at 18.]  Among patients with the more severe degree of bone fracture and dislocation of the ankle joint, Dr. Franco opines that the risk of developing post-traumatic arthritis is greater than 50%, because "the amount of energy, the amount of movement of the bones, and the location of the fractures" has a greater tendency "to develop a worn-out joint." [Doc. 46-2, at 19.]  Plaintiff fits in the latter category because Dr. Franco personally observed that Plaintiff has the most severe form of ankle injury:  "She has both a fracture of the bones and extreme movement of the bones, suggesting a lot of injury . . . to the ankle." [Doc. 46-2, at 18.]

The two studies that Dr. Franco cites in his deposition testimony also support this inference.  "The presence of a fracture-dislocation of the ankle joint considerably worsens the long-term results because of the cartilaginous damage that is produced at the time of dislocation and because of extensive lesions of the soft tissues."  F. Specchiulli & R. Mangialardi, The surgical treatment of malleolar fractures:  long-term results, 89 Chir. Organi Mov. 313, 316 (2004); accord Gregory A. Day et al., Operative Treatment of Ankle Fractures:  A Minimum Ten-Year Follow-Up, 22 Foot Ankle Int. 102, 105 (2001) (confirming that "severity of the initial injury" was a "poor prognostic factor").

On cross-examination, Dr. Franco acknowledged that two of the other risk factors identified in the studies he cites (*i.e.*, lack of reduction of the fracture and being a female between 45 and 65 years old) were not present in Plaintiff's case because she was only 25 years old at the time her ankle was broken, and the reduction in her fracture was good. [Doc. 40-2, at 6-7.] Elsewhere in his deposition testimony, however, Dr. Franco did account for Plaintiff's age and her ability to heal, reasoning that a younger, more active person has a longer life expectancy and is expected make use of her ankle for a longer period of time, thus presenting a greater opportunity for the ankle joint to "wear out" and develop arthritis over the course of a lifetime of use. [Doc. 46-2, at 21.]

Based on the deposition testimony cited above, I conclude that Plaintiff has shown a reliable basis to support Dr. Franco's opinion on the prognosis for Plaintiff's ankle injury as a matter of reasonable medical probability. Contrary to Defendant's contentions, I do not find that Dr. Franco's reasoning suffers from a logical gap between the studies he cites and the conclusion that he draws from them. This is not a case where a doctor attempts to apply the results of medical studies to a patient without knowing any additional facts about the patient. On the contrary, Dr. Franco's knowledge of particular details concerning the severity of Plaintiff's injury and other risk factors gives him the additional facts needed to place that injury on the continuum of those reported in the studies he cites.

My findings as to the reliability of Dr. Franco's methods and conclusions are provided for the limited purpose of determining the admissibility of his deposition testimony under <u>Daubert</u> and its progeny, and I express no opinion as to the credibility of such testimony. As in any case involving

expert testimony, defense counsel was free to cross-examine Dr. Franco about other factors which the doctor may have overlooked or discounted in relating Plaintiff's injury to the studies he reviewed.  In accordance with routine practice in other cases, the Court will instruct the jurors that they are free to evaluate the credibility of Dr. Franco's testimony and to give it such weight as they may think it deserves.  If the jurors should decide that Dr. Franco's opinion is not based on sufficient education and experience, or if they should conclude that the reasons given in support of his opinion are not sound, or that his opinion is outweighed by other evidence, then they may disregard his opinion entirely.

## III. CONCLUSION

For the foregoing reasons, the Court concludes that Dr. Franco's expert testimony regarding the prognosis for Plaintiff's ankle injury is admissible at trial, while Mr. Fisher's lay opinion testimony regarding the reasons he thought Ms. Gallegos' vehicle entered the intersection (*e.g.*, that she was speeding or did not see the light turn yellow) is not admissible at trial.  These conclusions are subject to reconsideration if unforeseen circumstances occur before or during the trial.

**IT IS, THEREFORE, ORDERED** that *Defendant's Motion in Limine to Exclude Speeding Testimony* [Doc. 36] is **GRANTED**.

**IT IS FURTHER ORDERED** that *Defendant's Motion in Limine to Exclude Certain Opinion Testimony of John Franco, M.D.* [Doc. 39] is **DENIED**.

**SO ORDERED**, this 5th day of April, 2007, in Albuquerque, New Mexico.

_____
**M. CHRISTINA ARMIJO**
*United States District Judge*